# UNITED STATES DISTRICT COURT

### for the

### Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No.   25MJ0073-VET |
| Apple Inc. | ) | |
| LAGonzalez7@gmail.com | ) | |
| ("Subject Account 1") | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 952 and 960 | Importation of a Controlled Substance |
| 21 USC Sec. 963 | Conspiracy to Import |

The application is based on these facts:

See Attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Alexander Doyle, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date:   January 3, 2025

_____
*Judge's signature*

City and state:  San Diego, California

Hon. Valerie E. Torres, United States Magistrate Judge
*Printed name and title*

# ATTACHMENT A-1

## PROPERTY TO BE SEARCHED

Apple Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records, and data located at One Apple Park Way, Cupertino, California, 95014.

Apple hosts the following electronic communication account that is the subject of this search warrant and application: *LAGonzalez7@gmail.com* ("**Subject Account 1**").

1
2                      **ATTACHMENT B-1**

3  **I.     *Service of Warrant***

4          The officer executing the warrant shall permit Apple Inc. ("Apple"), as custodian

5  of the computer files described in Section II below, to locate the files and copy them

6  onto removable electronic storage media and deliver the same to the officer.

7  **II.    *Items Subject to Seizure from Apple***

8          To the extent that the information described in **Attachment A-1** is within the

9  possession, custody, or control of Apple, regardless of whether such information is

10 located within or outside of the United States, and including any emails, records, files,

11 logs, or information that has been deleted but is still available to Apple, Apple is

12 required to disclose the following information to the government for each account or

13 identifier listed in **Attachment A-1**:

14         a.      All records or other information regarding the identification of the

15 account, to include full name, physical address, telephone numbers, email addresses

16 (including primary, alternate, rescue, and notification email addresses, and verification

17 information for each email address), the date on which the account was created, the

18 length of service, the IP address used to register the account, account status, associated

19 devices, methods of connecting, and means and source of payment (including any credit

20 or bank account numbers);

21         b.      All records or other information regarding the devices associated

22 with, or used in connection with, the account (including all current and past trusted or

23 authorized iOS devices and computers, and any devices used to access Apple services),

24 including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers

25 ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC")

26 addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers

27 ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers

28 ("MEID"), Mobile Identification Numbers ( "MIN"), Subscriber Identity Modules

("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.     The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.     The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.     The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.     All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including

purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

        g.    All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps to include date and time stamps;

        h.    All records pertaining to the types of service used; and

        i.    All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken.

## III.   *Search and Items to be Seized by the Government.*

The search of the data supplied by Apple pursuant to this warrant will be conducted by the HSI as provided in the "Procedures For Electronically-Stored Information" section of the affidavit submitted in support of this search warrant and will be limited to the period of **October 16, 2024** [two weeks before Gonzalez' crossed into the United States from Mexico on October 30, 2024], up to and including **November 6, 2024** [the date of Gonzalez' arrest], and to seizure of evidence:

        a) tending to indicate communications, photographs, videos, or other data depicting methamphetamine or other controlled substances, paraphernalia (such as pipes, scales, packaging and/or packing materials) along with any proceeds attained from the distribution of controlled substances;

        b) tending to identify communications, photographs, videos, or other data shared with and between co-conspirators coordinating and then executing controlled substances transactions;

c) tending to identify communications, photographs, videos, or other data shared with and between co-conspirators, their source(s) of supply, and/or customers made about or in specifics of controlled substances;

d) tending to identify internet and web-search history relating to controlled substances distribution;

e) tending to identify communications, photographs, videos, or other data regarding proceeds from controlled substances transactions or otherwise attempting to hide or give away what appears to be proceeds from controlled substances;

f) tending to identify geolocational information relevant to the stash houses and/or distribution of controlled substances;

g) tending to identify communications, photographs, videos, or other data made about covering up or hiding crimes and escaping or hiding from law enforcement; and/or,

h) tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of Sections 841 and 846 (conspiracy to distribute, distribution of, and possession with intent to distribute controlled substances), Title 21 U.S.C., Sections 952, 960, and 963 (importation and conspiracy to import controlled substances) (the **Target Offenses**).

# AFFIDAVIT

I, Special Agent Alexander Doyle, being duly sworn, hereby state as follows:

## I.

## INTRODUCTION

1.    I submit this affidavit in support of an application for a search warrant to under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Apple Inc. ("Apple") to disclose to the government records and other information, including all Apple iCloud electronically stored digital files, including deleted files, and the contents of communications associated with the following email addresses:

        a.   *iCloud Account* – Registered under *LAGonzalez7@gmail.com* ("**Subject Account 1**"), and

        b.   *iCloud Account* – Registered under *LeydiGonzalez420@icloud.com* ("**Subject Account 2**")

(collectively, the "**Subject Accounts**"), that are stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at One Apple Park Way, Cupertino, CA. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments **A-1**, **A-2**, **B-1**, and **B-2** and relates to the investigation and prosecution of Leydi Gonzalez ("Gonzalez") for importing approximately 46.68 kilograms (102.91 pounds) of methamphetamine from Mexico into the United States.

2.    There is probable cause that these records and information constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, Title 21 U.S.C., Sections 952, 960 and 963 (importation and conspiracy to import controlled substances), Sections 841 and 846 (conspiracy to distribute and possession with intent to distribute controlled substances (hereinafter, the "**Target Offenses**"), as described in Attachments **B-1** and **B-2**.

//

//

## II.

## **TRAINING AND EXPERIENCE**

3.    I have been employed as a Special Agent with Homeland Security Investigations ("HSI") since January of 2024. I am currently assigned to the HSI Office of the Deputy Special Agent in Charge, in San Ysidro, California. I am a graduate of the Federal Law Enforcement Training Center ("FLETC") and have completed 900 hours of training as part of the Criminal Investigator Training Program and HSI Special Agent Training Programs at the FLETC. As a result of my training and experience as a Special Agent, I am familiar with federal criminal laws relating to controlled substance violations. As part of my training, I have completed course studies in, among other things, criminal law, constitutional law, search and seizures, courtroom procedure, evidence processing, drug smuggling, and other drug-related offenses. Additionally, previous to my employment with HSI, I was employed by the San Diego County Sheriff's Department for over 13 years. During my time with the San Diego County Sheriff's Department, I worked as deputy, corporal, detective, and sergeant.

4.    During my training at FLETC, I learned fundamentals of how to conduct criminal investigations including, but not limited to, gathering of evidence, preservation of a crime scene, and use of electronic evidence – all in relation to violations of the United States Code.  I have participated in training related to controlled substances, including but not limited to marijuana, cocaine, methamphetamine, heroin, and fentanyl.  I have also received training in the methods used by illicit drug traffickers to import, distribute, package, and conceal controlled substances.

5.    As an HSI Special Agent, I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States, and thereby authorized to request issuance of federal search and seizure warrants. As a Special Agent with HSI, I have recently worked in a Contraband Smuggling Unit which involves the investigation of Transnational Drug Trafficking Organizations ("DTO"). During my tenure

1   with HSI, I have participated in the investigation of various DTOs involved in the
2   importation and distribution of controlled substances into and through the Southern District
3   of California. Through my training, experience, and work with other law enforcement
4   officers experienced in drug trafficking investigations, I have gained a working knowledge
5   of the operational habits of drug traffickers. My work on DTO investigations has resulted
6   in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of
7   persons for controlled substances violations.

8       6.    Through my training, experience, and conversations with other members of
9   law enforcement, I have gained a working knowledge of the operational habits of drug
10  traffickers, in particular those who attempt to import drugs into the United States from
11  Mexico. I am aware that it is common practice for illicit drug smugglers to work in concert
12  with other individuals and to do so by utilizing cellular telephones. Because they are
13  mobile, the use of cellular telephones permits illicit drug traffickers to easily carry out
14  various tasks related to their trafficking activities, including, *e.g.*, remotely monitoring the
15  progress of their contraband while it is in transit, providing instructions to drug couriers,
16  warning accomplices about law enforcement activity, and communicating with co-
17  conspirators who are transporting drugs and/or proceeds from drug sales.

18      7.    In preparing this affidavit, I have conferred with other agents and law
19  enforcement personnel who are experienced in the area of drug trafficking organizations.
20  Further, I have personal knowledge of the following facts, or have had them related to me
21  by persons mentioned in the affidavit. This affidavit is intended to show simply that there
22  is sufficient probable cause for the requested warrant and does not set forth all of my
23  knowledge about this matter. I set forth only facts necessary to establish the foundation for
24  the requested order. Conversations are set forth below in substance unless noted. Many of
25  the communications described and quoted in this affidavit occurred in Spanish. Here, I
26  offer good-faith summary translations of these communications for the purpose of
27  establishing probable cause. My interpretations of certain statements are set forth in
28

1  brackets and are based upon my knowledge of this investigation, my training, and my
2  experience. Dates, times, and amounts are approximate.

3      8.    Based on the facts as set forth in this affidavit, there is probable cause to
4  believe that the information described in Attachment **A-1**, **A-2**, **B-1**, and **B-2** contains
5  evidence of violations of the **Target Offenses** as described in Attachment **B-1** and **B-2**. I
6  am aware that it is common practice for drug traffickers to work in concert utilizing cellular
7  telephones to maintain and store communications and related items with co-conspirators to
8  further their criminal activities.  A common tactic utilized by drug traffickers is to import
9  controlled substances into the United States or transport-controlled substances within the
10  United States by concealing the controlled substances in vehicles, and sometimes hidden
11  inside other containers, that travel into or within the United States, specifically, within San
12  Diego County prior to further distribution of the controlled substances.  With respect to the
13  importation, transportation, and distribution of drugs in this manner, I am aware that drug
14  traffickers in Mexico and the United States frequently communicate with the individuals
15  responsible for importation, transporting, and distributing the controlled substances within
16  the United States.  These communications can occur before, during and after the drugs are
17  imported, transported, and distributed within the United States. For example, prior to the
18  importation, and subsequent transportation, drug traffickers frequently communicate with
19  the driver regarding arrangements and preparation for the drug importation/transportation.
20  When the importation and subsequent transportation is underway, drug traffickers
21  frequently communicate with the driver to remotely monitor the progress of the drugs,
22  provide instructions to the driver and warn accomplices about law enforcement activity.
23  When the drugs have been successfully imported into the United States and are to be
24  transported further into the United States, drug traffickers may communicate with the
25  courier or driver to provide further instructions regarding the transportation of the drugs
26  for distribution within the United States.

27  //
28  //

## III.

## JURISDICTION

9.     This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States … that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## IV.

## FACTS SUPPORTING PROBABLE CAUSE

### Gonzalez Applies for Entry into the United States

10.     On November 6, 2024, Gonzalez applied for entry into the United States from Mexico through the Tecate, California Port of Entry in Vehicle Lane #1. Gonzalez was the driver and sole occupant of a 2014 Subaru Crosstrek ("the vehicle") bearing California license plates.

11.     A Customs and Border Protection Officer ("CBPO") received two negative customs declaration from Gonzalez. Gonzalez stated she was crossing the border to go to Rancho San Diego, California. The CBPO received a computer-generated alert when he swiped Gonzalez' passport. Both Gonzalez and the vehicle were referred for further inspection.

12.     A CBPO operating the Z-Portal X-Ray machine detected anomalies throughout the vehicle.

13.     A Canine Enforcement Team was conducting secondary inspection operations when the Human and Narcotic Detection Dog alerted to the bumper of the vehicle.

### Discovery of Controlled Substances in Gonzalez' Vehicle

14.     Further inspection of the vehicle resulted in the discovery of 94 packages concealed in the driver's side front door, driver's side rear door, passenger's side front door, passenger's side rear door, rear bumper, passenger's side front bumper, passenger's side front fender, firewall, and gas tank, with a total approximate weight of 46.68 kgs

1  (102.91 lbs). A sample of the substance contained within the packages field tested positive
2  for the characteristics of methamphetamine.

3       15.    Gonzalez was placed under arrest at about 12:38 P.M.

4       16.    During a post-*Miranda* interview, Gonzalez denied knowledge that the drugs
5  were in the vehicle. Gonzalez stated that she was going to find a job in the Rancho San
6  Diego area.

7       17.    Gonzalez was arrested and charged with a violation of Title 21, United States
8  Code, Sections 952 and 960, importation of a controlled substance.

9  ***Discovery of Gonzalez' Cellular Telephone***

10      18.    A Customs and Border Protection Officer who was tasked to perform a
11 secondary inspection of the vehicle and inventory all the property seized from Gonzalez
12 and the vehicle found and seized one cellular telephone, specifically from Gonzalez' front
13 jacket pocket.

14 ***Search Warrant Issued for Gonzalez' Cellular Telephone***

15      19.    On November 7, 2024, the Honorable Benjamin J. Cheeks, United States
16 Magistrate Judge for the Southern District of California, issued a search warrant for the
17 cellular telephone found and seized from Gonzalez.

18 ***Probable Cause for the Subject Accounts***

19      20.    Agents were successful in extracting some data from the cellular telephone
20 seized from Gonzalez. However, only limited information was found on the cellular
21 telephone because the cellular telephone had been "Factory Reset" or wiped on October
22 31, 2024.

23      21.    A review of Gonzalez' TECS crossing records showed that on October 30,
24 2024 [one day before the "Factory Reset"], Gonzalez crossed alone from Mexico into the
25 United States through the Tecate, California Port of Entry driving the same vehicle in
26 which she was arrested on November 6, 2024.

27
28

22.     Moreover, despite the limited available data downloaded from Gonzalez's cellular telephone, the download revealed that two Apple IDs [the **Subject Accounts**] were registered to the cellular telephone.

23.     On or about December 11, 2024, law enforcement requested that Apple preserve the iCloud data associated with the **Subject Accounts**. That same day, Apple confirmed that the data was being preserved.

24.     Based upon my experience and training, consultation with other law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that cellular telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Subject Accounts** linked to Gonzalez' cellular telephone.  In light of the above facts and my experience and training, there is probable cause to believe that Gonzalez was using the **Subject Accounts** to communicate with others to further the importation of illicit drugs into the United States.  Further, in my training and experience, drug traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the drugs.

***Temporal Scope of iCloud Search Warrant***

25.     Given the arrest of Gonzalez on November 6, 2024, for importing methamphetamine, and a suspected previous successful border crossing on October 30, 2024, I am requesting account data for the **Subject Accounts** for data beginning on **October 16, 2024** [two weeks before Gonzalez' first crossed into the United States from Mexico on October 30, 2024] , up to and including **November 6, 2024** [the date of Gonzalez' arrest].

26.     Additionally, it is believed that the records are still available to Apple as a request to preserve was made under 18 U.S.C. § 2703(f).

## V.

## INFORMATION REGARDING APPLE ID AND iCLOUD

27.    Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a.  Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.  iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.  iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services and can also be used to store iOS device backups and data associated with third-party apps.

d.  iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and

passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.    Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.    Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g.    Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h.    App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

28.    Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

29.    An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

30.    Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

31.    Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

32.    Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that

computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

33.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

34.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

35.     For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and

experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

36.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

37.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

38.    Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

39.    Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services.

In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## VI.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

40.    Law enforcement obtained a search warrant for Gonzalez's cellular telephone on November 7, 2024.   While there are prior attempts to search Gonzalez' cellular telephone, there have been no prior attempts to search Gonzalez' iCloud accounts.

## VII.

## PROCEDURES FOR ELECTRONICALLY-STORED INFORMATION

41.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment **B-1** and **B-2**. Upon receipt of the information described in Section I of Attachment **B-1** and **B-2**, government-authorized persons will review that information to locate the items described in Section II of Attachment **B-1** and **B-2**.

42.    Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The Apple's personnel are not.  It would be inappropriate and impractical for federal agents to search the Apple's vast computer network for the relevant accounts and then to analyze the contents of those accounts on the Apple's premises.  The impact on its business would be disruptive and severe.

43.    Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the subject Apple accounts, as described in Attachment **B-1** and **B-2**. In order to accomplish the objective of the search warrant with a minimum of interference

with the Apple's business activities, to protect the privacy of its subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, agents seek authorization to allow Apple to make digital copies of the entire contents of the accounts subject to seizure. Those copies will be provided to me or to an authorized federal agent. The copy will be imaged, and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment **B-1** and **B-2**. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

44. Analyzing the data to be provided by Apple may require special technical skills, equipment, and software. It may also be time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang or typographical errors. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Attachments to electronic mail messages are often in proprietary formats that do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. Internet Service Providers like Microsoft and Google do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

45. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by Apple, examiners may need to review each record to determine if it is

responsive to Attachment **B-1** and **B-2**. The personnel conducting the examination of Apple's records **will complete the analysis within one hundred twenty (120) days** of receipt of the data from the service provider, absent further application to this court.

46.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the **Subject Accounts** and any electronic communications sent or received in temporal proximity to incriminating messages that provide context to the incriminating communications.

47.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**VIII.**

**CONCLUSION**

48.    Based on the foregoing, I request that the Court issue the proposed search warrant for the **Subject Accounts**, as described in **Attachments A-1** and **A-2,** for evidence as outlined in **Attachments B-1** and **B-2.**

I swear the foregoing is true and correct to the best of my knowledge and belief.

Special Agent Alexander Doyle
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 3rd day of January 2025.

HON. VALERIE E. TORRES
United States Magistrate Judge